IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROSEMARIA MCNEIL SAMPSON     :
    :            CIVIL ACTION
        v.           :            NO. 05-6414
    :
THE SCHOOL DISTRICT OF LANCASTER, :
ET AL.                              :

**SURRICK, J.**                                     **NOVEMBER  5, 2008**

**MEMORANDUM & ORDER**

Presently before the Court are Plaintiff's Motion to Compel Deposition of Donna Weldon, Esquire (Doc. No. 49) and Defendants' Response thereto and Cross Motion for Protective Order (Doc. No. 51). For the following reasons, Plaintiff's Motion will be denied, and Defendants' Motion will be granted.

**I.      BACKGROUND**

In July 2003, Plaintiff Rosemaria McNeil-Sampson ("Plaintiff") began her employment as Defendants' Assistant Superintendent of Curriculum and Instruction in Lancaster, Pennsylvania. (First Am. Compl. ¶¶ 4, 11; Defs.' Ans. ¶¶ 4, 11.) In October 2004, Plaintiff alleges that she witnessed Defendant Superintendent Rita Bishop direct various racially discriminatory acts and comments toward Plaintiff and others. (First Am. Compl. ¶ 15.) Five months later, Plaintiff filed an EEOC charge alleging racial discrimination and a hostile work environment. (First Am. Compl. ¶ 22; Defs.' Ans. ¶ 22.) On June 1, 2005, Plaintiff participated in a mediation with Defendants through the Equal Employment Opportunity Commission ("EEOC"). (First Am. Compl. ¶ 23; Defs.' Ans. ¶ 23.) Diane Weldon, Esquire, ("Weldon") represented Defendants throughout the EEOC proceedings and attended the mediation. (Pl.'s

Mem. of Law at 1; Defs.' Mem. of Law at 2.)  No members of Defendants' School Board attended the mediation. (Pl.'s Mem. of Law at 1.)

On June 14, 2005, Weldon prepared a memorandum about the EEOC mediation (the "Weldon Memorandum") and directed it to the Board of School Directors.[1]  (Pl.'s Mem. of Law at 1; Defs.' Mem. of Law at 2.)   The Weldon Memorandum is labeled "confidential" and is "from Donna Weldon, Defense Counsel."  (Id.)  The Weldon Memorandum discusses Defendants' negotiations with Plaintiff about a potential settlement and, for purposes of obtaining settlement authority, includes Weldon's recollections and impressions of the positions that both sides adopted at the EEOC mediation.  For example, the Weldon Memorandum offers Weldon's assessment to the Board of School Directors that Plaintiff's "allegations and her statements at the mediation arose from her feelings of being berated, demeaned, or marginalized by [Defendants] Dr. Bishop and the District. . . ."  (Pl.'s Mem. of Law at 2.)  The Weldon Memorandum also states that "[t]he aggressive verbal tactics and perception of conspiracy [Plaintiff] demonstrated at the mediation are inconsistent with any ongoing relationship with the school district."  (Id.)

Plaintiff alleges that the President of the Board of School Directors, Patricia Dixon ("Dixon"), provided her with a copy of the Weldon Memorandum.  (Pl.'s Mem. of Law at 7; Defs.' Mem. of Law at 8.)  Plaintiff does not state when Dixon gave her the Weldon Memorandum, and it is not apparent to this Court when Dixon might have done so.  Plaintiff

---

[1] Plaintiff did not file the Weldon Memorandum on the public record "because of its sensitive contents," but she submitted it to chambers for inspection. (Letter from Plaintiff's counsel to the Court (Oct. 14, 2008)).  We have considered the Weldon Memorandum in its entirety for the purposes of this opinion, although we quote only those portions that Plaintiff has already quoted in her public submissions.

produced the Weldon Memorandum during discovery.  (Pl.'s Mem. of Law at 2.)

On June 21, 2005, a week after Weldon prepared the memorandum, the Board of School Directors voted to terminate Plaintiff's employment contract.[2]  (First Am. Compl. ¶ 24; Defs.' Ans. ¶ 24.)  Plaintiff's termination of employment was effective shortly thereafter.  (First Am. Compl. ¶ 24.)  Plaintiff filed a second EEOC charge on October 24, 2005, alleging, among other things, that Defendants terminated her employment in retaliation for her participation in the June 1, 2005 mediation.  (First Am. Compl. ¶ 56; Defs.' Ans. ¶ 56.)

On December 13, 2005, Plaintiff brought this federal lawsuit alleging numerous causes of action arising out of the termination of her employment with the School District.  (Doc. No. 1.)  On January 12, 2006, Plaintiff filed a First Amended Complaint.  (Doc. No. 2.)  The First Amended Complaint includes the allegation that Defendants terminated Plaintiff's employment in retaliation for her participation in the mediation.  (First Am. Compl. ¶ 25.)  Defendants deny that Plaintiff's termination was because of her participation in the mediation and assert an affirmative defense that Plaintiff's termination "was in accordance with the contract to which Plaintiff agreed."  (Defs.' Ans. ¶¶ 23, 25.)  Defendants do not assert an affirmative defense that they relied on their attorney's advice in the Weldon Memorandum in deciding to terminate Plaintiff's employment.

On or about September 15, 2008, Plaintiff noticed Weldon's deposition.  (Defs.' Mem. of Law at 1; id., Ex. A (subpoena of Donna Weldon (undated)) ("Weldon Subpoena.")  The Weldon Subpoena commands Weldon to appear for a deposition on October 7, 2008, and directs her to

---

[2] Plaintiff's employment contract provided that the contract "shall terminate" upon "written request of [the School District of Lancaster's] Board of School Directors, which request may be made with or without cause."  (First Am. Compl. ¶ 13; Defs.' Ans. ¶ 25.)

bring the following documents:

> 1.  All notes and other documents relating to the June 1, 2005 EEOC Mediation involving Rosemaria McNeil Sampson;
>
> 2.  All notes and other documents relating to the June 14, 2005 meeting of the Board of School Directors of the School District of Lancaster.

(Defs.' Mem. of Law, Ex. A.)

Plaintiff has moved to compel Weldon's deposition.  (Doc. No. 49.)  Defendants oppose Plaintiff's motion and have moved for a protective order on grounds of attorney-client privilege, work product doctrine, and a purported federal mediation privilege.  Defendants seek to quash the subpoena for Weldon's deposition and to preclude Plaintiff "from utilizing the Weldon Memorandum for any purpose."  (Doc. No. 51.)

## II.   LEGAL STANDARD

Defendants base their opposition to Plaintiff's motion to compel and their motion for a protective order on three distinct privilege doctrines:  (1) the attorney-client privilege; (2) the work product doctrine; and (3) a purported federal mediation privilege.

### A.   Attorney-Client Privilege

The attorney-client privilege limits the normally broad disclosure requirements of Federal Rule of Civil Procedure 26, which provide that relevant but privileged matters are not discoverable.  Fed. R. Civ. P. 26(b)(1); Martin Marietta Materials, Inc. v. Bedford Reinforced Plastics, Inc., 227 F.R.D. 382, 389 (W.D. Pa. 2005).  As the "oldest of the privileges for confidential communications known to the common law," it serves the purpose of "foster[ing] disclosure and communication between the attorney and the client."  Upjohn Co. v. United States, 449 U.S. 383, 389 (1981); In re Grand Jury Investigation, 599 F.2d 1224, 1235 (3d Cir.

1979).  The privilege "recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." Upjohn, 449 U.S. at 389.

However, courts have recognized that "the privilege obstructs the search for the truth and because its benefits are, at best 'indirect and speculative,' it must be 'strictly confined within the narrowest possible limits consistent with the logic of its principle.' " In re Grand Jury Investigation, 599 F.2d at 1235 (quoting 8 Wigmore on Evidence § 2291, at 545 (1961)).  As such, the party claiming that the privilege exists bears the burden of proving that it applies to the communication at issue.  In re Grand Jury Empanelled Feb. 14, 1978, 603 F.2d 469, 474 (3d Cir. 1979) (citing United States v. Landof, 591 F.2d 36, 38 (9th Cir. 1978)).  Whether the privilege applies is a question of law to be decided by the court.  Andritz Sprout-Bauer, Inc. v. Beazer E., Inc., 174 F.R.D. 609, 632 (M.D. Pa. 1997).  The attorney-client privilege will not apply where the party asserting it cannot demonstrate that:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

In re Grand Jury Investigation, 599 F.2d at 1233 (citing United States v. United Shoe Mach. Corp., 89 F. Supp. 357, 358-59 (D. Mass. 1950)).  "The central inquiry is whether the communication was made by a client to an attorney for the purpose of obtaining legal advice." In re Spalding Sports Worldwide, 203 F.3d 800, 805 (Fed. Cir. 2000).  The attorney-client privilege applies not just to communications from the client to the attorney, but from the attorney

to the client as well.  See In re Linerboard Antitrust Litig., 237 F.R.D. 373, 381 (E.D. Pa. 2006)

(citing Upjohn, 449 U.S. at 390) ("The privilege covers communications made by the client as

well as the attorney[.]"); see also United States v. Amerada Hess Corp., 619 F.2d 980, 986 (3d

Cir. 1980) ("Legal advice or opinion from an attorney to his client . . . has consistently been held

by the federal courts to be within the protection of the attorney-client privilege.") (citations

omitted).

> There are some exceptions, however, even if the requirements are satisfied:
>
> The protective cloak of [attorney-client] privilege does not extend to information which an attorney secures from a witness while acting for his client in anticipation of litigation.  Nor does this privilege concern the memoranda, briefs, communications and other writings prepared by counsel for his own use in prosecuting his client's case; and it is equally unrelated to writings which reflect an attorney's mental impressions, conclusions, opinions or legal theories.[3]

Hickman v. Taylor, 329 U.S. 495, 508 (1947).

The attorney-client privilege is not absolute, and the privilege may be waived in certain

circumstances.  See Westinghouse Elec. Corp. v. Philippines, 951 F.2d 1414, 1428-29 (3d Cir.

1991) (noting that the privilege may be waived through disclosure).  In this Circuit, "[t]he

attorney-client privilege is waived for any relevant communication if the client asserts as a

material issue in a proceeding that:  (a) the client acted upon the advice of a lawyer or that the

advice was otherwise relevant to the legal significance of the client's conduct."  Livingstone v.

North Belle Vernon Borough, 91 F.3d 515, 537 (3d Cir. 1996).  "Finding a waiver of the

---

[3]  Such writings are instead protected from disclosure under the attorney work product doctrine, discussed infra.  See Hickman, 329 U.S. 495, 510 (noting that counsel's attempt "to secure written statements, private memoranda and personal recollections prepared or formed by an adverse party's counsel in the course of his legal duties . . . falls outside the arena of discovery and contravenes the public policy underlying the orderly prosecution and defense of legal claims.")

attorney client privilege when the client puts the attorney's advice in issue is consistent with the essential elements of the privilege.  That is, in leaving to the client the decision whether or not to waive the privilege by putting the attorney's advise in issue, . . . the client's confidential communications will not be disclosed unless the client takes an affirmative step to waive the privilege . . . ."  Rhone-Poulenc Rorer Inc. v. Aetna Cas. & Sur. Ins., 32 F.3d 851, 863 (3d Cir. 1994).  "A party who asserts a claim that 'in fairness requires examination of protected communications thereby waives the attorney-client privilege as to those communications.'"  Id. (quoting United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991)).  Therefore, "not only must a party put its attorneys [sic] advice at issue, it must be unfair to the opposing party not to disclose the attorney-client communications."  In re AT&T Access Charge Litig., 451 F. Supp. 2d 651, 655 (D.N.J. 2006).

### B.     Work Product Doctrine

Next, Defendants rely on the work product doctrine recognized by the Supreme Court in Hickman v. Taylor, 329 U.S. 495, 512 (1947).  The Supreme Court in Hickman recognized "the general policy against invading the privacy of an attorney's course of preparation," and further recognized that work product covers "written materials obtained or prepared by an adversary's counsel with an eye toward litigation," including "interviews, statements, memoranda, correspondence, briefs, mental impressions, [and] personal beliefs. . . ."  Id. at 511.  Federal Rule of Civil Procedure 26(b)(3) codifies that principle in the federal work-product doctrine:

> Ordinarily, a party may not discover documents and tangible things that are prepared
> in anticipation of litigation or for trial by or for another party or its representative
> (including the other party's attorney, consultant, surety, indemnitor, insurer, or
> agent).

> But, subject to Rule 26(b)(4), those materials may be discovered if:

7

(i) they are otherwise discoverable under Rule 26(b)(1); and

(ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

Fed. R. Civ. P. 26(b)(4).  The doctrine "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." In re Cendant Corp. Sec. Litig., 343 F.3d 658, 661-62 (3d Cir. 2003) (quoting United States v. Nobles, 422 U.S. 225, 238 & n.11 (1975)).  The party asserting work product protection bears the burden of showing that the doctrine applies.  See Conoco, Inc. v. U.S. Dep't of Justice, 687 F.2d 724, 730 (3d Cir. 1982).

### C.    Federal Mediation Privilege

Finally, Defendants rely on a purported federal mediation privilege.[4]  "The United States Supreme Court has cautioned federal courts to create or expand federal privileges only with extreme reluctance." Brunt v. Hunterdon County, 183 F.R.D. 181, 184 (D.N.J. 1998) (citing Univ. of Pa. v. E.E.O.C., 493 U.S. 182, 189 (1990); Herbert v. Lando, 441 U.S. 153, 175 (1979)).  At least one district court within the Third Circuit has recognized a federal mediation privilege.  See Sheldone v. Pa. Turnpike Comm'n, 104 F. Supp. 2d 511, 515 (W.D. Pa. 2000).  In

---

[4] Defendants' reliance on the Pennsylvania mediation privilege is misplaced.  See 42 Pa. Cons. Stat. Ann. § 5949(a) (providing that "all mediation communications and mediation documents are privileged").  Federal privilege law controls when, as here, a case in federal court involves both state and federal claims. Wei v. Bodner, 127 F.R.D. 91, 94 (D.N.J. 1989) (citing Wm. T. Thompson Co. v. Gen. Nutrition Corp., Inc., 671 F.2d 100 (3d Cir. 1982) ("Where, as here, there are both federal and state law claims, federal privileges rather than state privileges apply to all claims."); see also Weiss v. County of Chester, 231 F.R.D. 202, 205 (E.D. Pa. 2005) ("In Pearson, the Third Circuit reaffirmed the rule that 'when there are federal law claims in a case also presenting state law claims, the federal rule favoring admissibility, rather than the state law privilege, is the controlling rule.'") (citing Pearson v. Miller, 211 F.3d 57, 66 (3d Cir. 2000)).

Sheldone, the plaintiffs brought a claim against defendant, their government employer, under the Fair Labor Standards Act.  Id. at 511-12.  The plaintiffs sought production of documents generated during the course of a mediation of union grievances.  Id. at 512.  The plaintiffs believed the documents might contain admissions that the defendant settled out of court because it realized that it had paid the employees "straight time" in violation of law.  Id.  The defendant filed a motion for a protective order to preclude discovery of mediation communications and mediation documents.  Id.  The employer asserted that the documents were privileged and urged the court to recognize a federal mediation privilege.  Id.

In recognizing a federal mediation privilege, the Sheldone court addressed each of the four factors for determining whether a potential federal evidentiary privilege should be recognized as announced by the Supreme Court in Jaffee v. Redmond, 518 U.S. 1 (1996).[5]  See Sheldone, 104 F. Supp. 2d at 512-13.  First, the court recognized that "it is beyond doubt that the mediation privilege is rooted in the imperative need for confidence and trust."  Id. at 514. Second, the court found that a lack of confidentiality would likely result in a reduction of those parties willing to participate in mediation and, for those who did agree to participate, the effectiveness of mediation would be adversely affected by the lack of confidentiality.  See id. Therefore, the public interest in encouraging settlements and preserving judicial resources supported the recognition of a mediation privilege.  See id.  Third, the court found that the evidentiary detriment would be modest, since the information would not exist but for the

---

[5] The four relevant factors are: (1) whether the asserted privilege is "rooted in the imperative need for confidence and trust;" (2) whether the privilege would serve public ends; (3) whether the evidentiary detriment caused by an exercise of the privilege is modest; and (4) whether denial of the federal privilege would frustrate a parallel privilege adopted by the states. See Jaffee, 518 U.S. at 9-13.

mediation.  See id. at 515 ("This Court sees no reasoned basis for allowing the Plaintiffs to enjoy the benefit of an alleged admission arising through the mediation process when it seems doubtful that such an admission would have otherwise come into existence.").  Finally, the court noted that "the nearly unanimous voices of state legislatures from across the country adopting mediation privileges" supports recognition of the privilege, as does the fact that failure to recognize a federal mediation privilege would frustrate the public policy objectives of those states that have recognized such a privilege.  Id. at 516; see also id. ("The states' 'promise[s] of confidentiality' regarding mediation 'would have little value if the [participants] were aware that the privilege would not be honored in . . . federal court.'").  The Sheldone court therefore granted the defendant's motion for a protective order to preclude discovery of mediation communications and mediation documents.  Id. at 518.

Courts in other jurisdictions have also recognized a federal mediation privilege.  See, e.g., In re RDM Sports Group, Inc., 277 B.R. 415, 430 (Bankr. N.D. Ga. 2002) ("This Court agrees with the reasoning and analysis put forth by these district courts [in adopting a federal mediation privilege].");  Folb v. Motion Picture Indus. Pension & Health Plans, 16 F. Supp. 2d 1164 (C.D. Cal. 1998), aff'd, 216 F.3d 1082, 2000 WL 420636 (9th Cir. Apr. 18, 2000) ("[T]his Court finds it is appropriate, in light of reason and experience, to adopt a federal mediation privilege applicable to all communications made in conjunction with a formal mediation.");  see also United States v. Union Pac. R.R. Co., No. 06-1740, 2007 WL 1500551, at *5 (E.D. Cal. May 23, 2007) (applying federal mediation privilege);  Microsoft Corp. v. Suncrest Enter., No. 03-5424, 2006 WL 929257, at *2 (N.D. Cal. Jan. 6, 2006) (same);  EEOC v. Northlake Foods, Inc., 411 F. Supp. 2d 1366, 1369 (M.D. Fla. 2005) (relying on local rule regarding

confidentiality of mediation proceedings to preclude party from disclosing amount of settlement

with a third party); Nielsen-Allen v. Indus. Maint. Corp., No. 2001/70, 2004 WL 502567, at *1

(D.V.I. Jan. 28, 2004) (noting that "[a] majority of jurisdictions recognize and enforce [a federal

mediation] privilege," but relying on mediation privilege set forth in local rule); U.S. Fid. &

Guar. Co. v. Dick Corp., 215 F.R.D. 503, 506-07 (W.D. Pa. 2003) (applying Pennsylvania

privilege law, but turning "to federal case law construing the federal mediation privilege for

guidance.").

  More recently, however, at least one federal district court has questioned the existence of

a federal mediation privilege.  In Molina v. Lexmark International, Inc., No. 08-4796, 2008 WL

4447678, at *9 (C.D. Cal. Sept. 30, 2008), the court noted that:

> The existence of a federal common law mediation privilege is not nearly as well
> established as [the defendant] suggests it is.  No Circuit court has ever adopted or
> applied such a privilege; indeed, both the Ninth and the Fourth Circuits have
> expressly declined to consider whether such a privilege exists.  See Babasa v.
> Lenscrafters, Inc., 498 F.3d 972, 975 n.1 (9th Cir. 2007) (declining to consider
> whether a federal mediation privilege exists); Dusek v. Mattel, Inc., 141 Fed. App'x
> 586, 588 n.2 (9th Cir. July 29, 2005) (unpublished opinion) (same); In re
> Anonymous, 283 F.3d 627, 639 (4th Cir. 2002) (same).  The Fifth Circuit, moreover,
> has specifically refused to infer the existence of a mediation privilege from a federal
> statute making mediation proceedings conducted under its aegis confidential.  See
> In re Grand Jury Subpoena Dated December 17, 1996, 148 F.3d 487, 493 (5th Cir.
> 1998).

Molina, 2008 WL 4447678, at *9 (format of citations altered).

  The Molina court drew a distinction between "confidential" and "privileged," and held

that while the defendant "asserts reliance on a 'mediation privilege,' it in fact invokes the duty of

confidentiality that prevents parties to a mediation from disclosing mediation communications

voluntarily."  Id. at *11; see also F.D.I.C. v. White, 76 F. Supp. 2d 736, 738 (N.D. Tex. 1999)

("Privileges are not lightly created and cannot be inferred absent a clear manifestation of

Congressional intent. . . . The Court does not read the [Alternative Dispute Resolution Act of 1998] or its sparse legislative history as creating an evidentiary privilege that would preclude a litigant from challenging the validity of a settlement agreement based on events that transpired at a mediation.").

The <u>Molina</u> court found that "Rule 408 of the Federal Rules of Evidence . . . provides a better reference point for analyzing [the defendant's] argument than does [the federal mediation privilege]." <u>Molina</u>, 2008 WL 4447678, at *11. Rule 408 makes conduct or statements made in compromise negotiations regarding the claim inadmissible to prove liability. <u>See</u> Fed. R. Evid. 408. The court applied the Rule 408 framework – rather than a federal mediation privilege – to analyze the plaintiff's use of two letters from a mediator to defense counsel to establish the amount in controversy. <u>See</u> <u>Molina</u>, 2008 WL 4447678, at *11.

## III.   DISCUSSION

We are asked to decide (1) whether the attorney-client privilege applies to the Weldon Memorandum, and if so, whether Defendants waived the attorney-client privilege through Dixon's disclosure of the Weldon Memorandum; and (2) whether the attorney-client privilege, the work product doctrine, or a federal mediation privilege applies to preclude Weldon from testifying at deposition about her observations at the EEOC mediation.

### A.   The Weldon Memorandum

Defendants assert that the Weldon Memorandum is protected from disclosure by the attorney-client privilege.

#### 1.   *Application of Attorney-Client Privilege*

The burden is on Defendants, the party asserting the privilege, to show that the privilege

applies.  See In re Grand Jury Empanelled Feb. 14, 1978, 603 F.2d 469, 474 (3d Cir. 1979).  The

attorney-client privilege applies "within the narrowest possible limits consistent with the logic of

its principle.' " In re Grand Jury Investigation, 599 F.2d at 1235.  That principle is best described

as "foster[ing] disclosure and communication between the attorney and the client."  Upjohn Co.

v. United States, 449 U.S. 383, 389 (1981).

We are satisfied that Defendants have met their burden of showing that the attorney-

client privilege applies to the Weldon Memorandum.[6]  Weldon is an attorney and member of the

Pennsylvania bar, and the Board of School Directors was her client.  The Weldon Memorandum

is a communication.  The memorandum was issued "To: Board of School Directors, School

District of Lancaster," and "From: Donna Weldon, Defense Counsel," and marked

"confidential."  The Weldon Memorandum discusses the parties' settlement negotiations to-date

and proposes the terms of a settlement.  The Board of School Directors had to approve the

settlement that Weldon proposed in the memorandum.  Weldon therefore provided a detailed

factual background about what transpired at the EEOC mediation as a "backdrop" to the Board's

consideration of her request for settlement authority.[7]

Removing the Weldon Memorandum from the protective shield of the attorney-client

---

[6] We decide this case on grounds other than the federal mediation privilege. Nevertheless, we find persuasive the reasoning set forth by the court in Sheldone v. Pa. Turnpike Comm'n, 104 F. Supp. 2d 511, 515 (W.D. Pa. 2000) and by other courts that have adopted the federal mediation privilege.  See, e.g., In re RDM Sports Group, Inc., 277 B.R. 415, 430 (Bankr. N.D. Ga. 2002); Folb v. Motion Picture Indus. Pension & Health Plans, 16 F. Supp. 2d 1164 (C.D. Cal. 1998), aff'd, 216 F.3d 1082, 2000 WL 420636 (9th Cir. Apr. 18, 2000).

[7] Weldon expressly describes the factual background as a "backdrop" in which the Board of School Directors should consider her request for settlement authority.  (Weldon Memorandum at P0263.)

privilege would stifle the principle of "foster[ing] disclosure and communication between the

attorney and the client." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981).  Defendants

asked Weldon to represent them in the course of the EEOC proceeding.  During that

representation, Weldon participated in the EEOC mediation and made certain observations in a

confidential memorandum she drafted to her client.  It is consistent with the principle of the

attorney-client privilege that Weldon should be free to communicate her observations from the

legal proceeding in order to assist the client in making a settlement decision.  That is precisely

what Weldon did.  If we were to find that such communications fall outside the scope of the

attorney-client privilege, attorneys like Weldon would be less likely to communicate their

observations from legal proceedings to facilitate settlement.  Such a result runs counter to the

principle of "full and frank communication" underlying the attorney-client privilege.  See

Upjohn, 449 U.S. at 389 (noting that the "purpose [of the attorney-client privilege] is to

encourage full and frank communication between attorneys and their clients").

        Plaintiff contends that certain portions of the Weldon Memorandum are purely factual in

nature, and as such, are not privileged.  See id. at 395-96 ("[T]he protection of the [attorney-

client] privilege extends only to communications and not to facts.  A fact is one thing and a

communication concerning the fact is an entirely different thing."); U.S. Fid. & Guar. Co. v.

Barron Indus., Inc., 809 F. Supp. 355, 364 (M.D. Pa. 1992) ("The [attorney-client] privilege

simply does not attach to a discussion of the facts, no matter how extensive or involved the

discussion may become.").  We agree that the Weldon Memorandum conveys certain facts that

Defendants observed at the EEOC mediation.  But, those facts are not as easily divorced from

Weldon's legal advice as Plaintiff would have us believe.  The facts in the Weldon

Memorandum are intended to justify Weldon's settlement proposal.  They are essentially reasons for the Board of School Directors to approve the settlement.  Weldon's discussion is more like a "communication concerning the fact[s]" for purposes of legal advice than a simple recitation of otherwise discoverable facts.  See Upjohn, 449 U.S. at 395-96.  In addition, disclosure of the "background facts" Weldon provided in the memorandum would undermine an open discussion of the merits of settlement.[8]

2.      <em>Waiver of Attorney-Client Privilege</em>

Plaintiff asserts that even if the attorney-client privilege applies to the Weldon Memorandum, Defendants waived the privilege when Dixon, the President of School Directors, gave Plaintiff a copy.  (Pl.'s Mem. of Law at 7.)  As the party challenging the privileged communication, Plaintiff bears the burden of showing that Defendants waived the privilege.  See Martin Marietta Materials, Inc. v. Bedford Reinforced Plastics, Inc., 227 F.R.D. 382, 390 (W.D. Pa. 2005) ("Once a party demonstrates the existence of an attorney-client privilege regarding specific communications, then the party challenging the privileged communication bears the burden of demonstrating that a waiver of the attorney-client privileged communication has occurred").  To satisfy her burden, Plaintiff contends that Dixon "had authority to waive any

---

[8] To the extent that the Weldon Memorandum conveys any facts not protected by attorney-client privilege, such facts would clearly be shielded from disclosure by the work product doctrine.  See Hickman, 329 U.S. 495, 511 (protecting from disclosure under the work product doctrine "written materials obtained or prepared by an adversary's counsel with an eye toward litigation," including "interviews, statements, memoranda, correspondence, briefs, mental impressions, [and] personal beliefs. . . ."); see also Fed. R. Civ. P. 26(b)(3) (codifying work product doctrine).  Plaintiff shows no "substantial need" for the Weldon Memorandum to justify an exception to the doctrine, and she can obtain, without undue hardship, the "substantial equivalent" by other means:  Plaintiff attended the same mediation and has access to her own notes and recollections of what transpired.  Fed. R. Civ. P. 26(b)(3).

privilege held by the [School District] or the [Board of School Directors]," since the

Pennsylvania Public School Code provides that school board presidents "shall perform such

other duties as . . . pertain to [her] office."[9]  (Pl.'s Mem. of Law at 7.)

Defendants rely on the same statute and contend that Dixon's distribution of the Weldon

Memorandum to Plaintiff was an ultra vires act.  Defendants contend that Dixon had no authority

to waive the attorney-client privilege, since "[t]he law in Pennsylvania is clear that the president

of a school board lacks the unilateral authority to bind the School District to actions such as the

making of contracts in the absence of approval by a majority of the board of school directors."

(Defs.' Mem. of Law at 9) (citing Albert Gallatin Area Sch. Dist. v. Penn Transp. Servs., Inc.,

---

[9]  The statute provides as follows:

> The president shall be the executive officer of the board of school
> directors, and as such he, together with the secretary, when directed
> by the board, shall execute any and all deeds, contracts, warrants to
> tax collectors, reports, and other papers pertaining to the business of
> the board, requiring the signature of the president.  In school districts
> other than in school districts of the first class he shall, after the board
> has acted on and approved any bill or account for the payment of
> money authorized by this act, sign an order on the treasurer for the
> payment of the same.  He shall in no case, except as this section
> otherwise provides, sign any order for any sum unless the same has
> first been acted upon and approved by the board, and the amount
> thereof and the name of the payee properly inserted. Any orders
> which shall be for the payment of amounts owing under any contracts
> which shall previously have been approved by the board, and by the
> prompt payment of which the district will receive a discount or other
> advantage, may be signed without the approval of the board first
> having been secured.  All such orders shall be presented to the board
> at its next meeting.  The president shall perform such other duties as
> the board may direct and as pertain to his office.

24 Pa. Cons. Stat. § 4-427 (2008).

704 A.2d 184 (Pa. Commw. Ct. 1997); <u>Sch. Dist. of Phila. v. Framlau Corp.</u>, 328 A.2d 866 (Pa.

Commw. Ct. 1974)).  Defendants note that the statute on which Plaintiff relies grants the school

board president "authority to act on behalf of the School District, but only when authorized by

the Board of School Directors in accordance with the law."  (Defs.' Mem. of Law at 9.)  For

example, the school board president "<u>when directed by the board</u>, shall execute any and all

deeds, contracts, warrants to tax collectors, reports, and other papers. . . ."  24 Pa. Cons. Stat. §

4-427 (2008) (emphasis added).  "[The school board president] <u>shall in no case</u>, except as this

section otherwise provides, sign any order for any sum unless the same has first been acted upon

and <u>approved by the board</u> . . . ."  <u>Id.</u> (emphasis added).

    We find that Dixon did not have authority to waive the attorney-client privilege when she

distributed the Weldon Memorandum, since waiving the privilege is not one of the "duties [that]

pertain[s] to [her] office."  <u>See</u> 24 Pa. Cons. Stat. § 4-427 (2008).  The Pennsylvania Public

School Code does not define which duties "pertain" to the school board president's office.  But,

a fair reading of the statute suggests that waiving the attorney-client privilege on a confidential

settlement memorandum is not one of them.  The statute vests the school board president with

certain powers to "execute any and all deeds, contracts, . . . and other papers," but only subject to

the school board's approval.  <u>See id.</u>  If a board president cannot execute even minor contracts

and "other papers" without the board's approval, we conclude that the board president cannot

waive the attorney-client privilege – a much more significant decision – on behalf of the school

district without the board's approval.  This conclusion is consistent with the practice already

employed by Pennsylvania school districts.  <u>See, e.g.</u>, <u>Monaghan v. Reading Sch. Dist.</u>, 618 A.2d

1239, 1242 (Pa. Commw. Ct. 1992) (noting that the Reading School District's attorney refused

to testify "until the school district would agree to waive the attorney client privilege," and as a

result, the "School Board voted 4 to 3 to tentatively not waive its attorney/client privilege."); cf.,

Miles-McClellan Constr. Co. v. Westerville Bd. of Educ., No. 05AP-1112, 2006 WL 1817223, at

*3 (Ohio Ct. App. June 30, 2006) (finding that even though an Ohio statute provided for school

board approval of all contracts, a school district's attorney could waive attorney-client privilege

as a "properly-appointed agent" whose appointment "was appropriately ratified" by the school

board).  Since Dixon distributed the Weldon Memorandum without board approval, she acted

ultra vires and did not waive Defendants' privilege.

Plaintiff next contends that Defendants waived the attorney-client privilege "[b]y

terminating Ms. Sampson in part because of her behavior at the mediation," thereby "[p]lacing

the mediation squarely in issue." (Pl.'s Reply at 3.)  See Robertson v. Allstate Ins. Co., No. 98-

4909, 1999 WL 179754, at *5 (E.D. Pa. Mar. 10, 1999) (citations omitted) ("In this Circuit, a

party waives the attorney-client privilege by placing the advice of counsel in issue only where

the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or

describing an attorney-client communication.").  Plaintiff does suggest a connection between the

Weldon Memorandum and the termination, see Pl.'s Mem. of Law at 3 ("The mediation was the

immediate precipitating cause of [Plaintiff's] termination; shortly after it occurred, the board

received the Weldon Memorandum, and decided to terminate Plaintiff."), but it is Defendants

who must place the Weldon Memorandum at issue.  See Robertson, 1999 WL 179754, at *5

(party waiving the privilege must take an "affirmative step" in the litigation to place the advice

of the attorney in issue).

Defendants have not placed Weldon's advice at issue, since they do not assert that they

18

terminated Plaintiff on their attorney's advice or upon receipt of the Weldon Memorandum.  One

of Defendants' affirmative defenses is that Plaintiff's termination "was in accordance with the

contract to which Plaintiff agreed."[10]  (Defs.' Ans. ¶ 23.)  This affirmative defense does not place

Weldon's advice at issue.[11]  See Oak Lane Printing & Letter Serv., Inc., v. Atl. Mut. Ins. Co.,

No. 04-3301, 2007 WL 1725201, at *3 (E.D. Pa. Jun. 13, 2007) (noting that "an advice of

counsel defense must be raised with sufficient specificity and cannot be raised by tenuous

conjecture."); McCrink v. Peoples Benefit Life Ins. Co., No. 04-1068, 2004 WL 2743420, at *3

(E.D. Pa. Nov. 29, 2004) (finding that defendant did not take affirmative step of putting the

advice of counsel in issue where defendant had "not pled the advice of counsel as an affirmative

defense"); cf. Waugh v. Pathmark Stores, Inc., 191 F.R.D. 427, 432 (D.N.J. 2000) (finding no

basis for waiver of attorney-client privilege where "Pathmark has not put the advice of [its

attorney] at issue," and noting that "[i]f Pathmark had wished to rely on [its attorney's] advice to

support the reasonableness of its investigation or remedial measures taken, this court would

order the information disclosed.").  Since Defendants have not placed Weldon's advice at issue,

the Weldon Memorandum retains its attorney-client privilege.

**B.     The Weldon Deposition**

Defendants have moved for a protective order to quash the subpoena for Weldon's

deposition "insofar as it (1) seeks information protected by the attorney-client privilege and/or

---

[10] Defendants state in a subsequent filing that "[t]he poor working relationship between the Superintendent and [Plaintiff] is a legitimate nondiscriminatory reason for terminating [Plaintiff's] contract for no cause as permitted under the employment contract."  (Defs.' Mot. to Dismiss ¶ 41.)

[11] Defendants' other affirmative defenses are not applicable.

19

work product doctrine; and (2) seeks information disclosed during the course of the confidential

EEOC mediation process."  (Defs.' Mem. of Law at 3.)  Plaintiff served a subpoena for

Weldon's deposition because of the Weldon Memorandum.  See Pl.'s Reply at 1 ("Plaintiff seeks

to depose Ms. Weldon because her report on what she saw and heard at the mediation [i.e., the

Weldon Memorandum] was . . . an immediate precipitating cause of [the School District's]

decision to terminate Ms. Sampson.") (emphasis added).  The deposition subpoena commands

Weldon to bring "all notes and other documents relating to the June 1, 2005 EEOC mediation"

and "all notes and other documents relating to the June 14, 2005 meeting of the Board of School

Directors."  (Defs.' Mem. of Law, Ex. A.)

        We need not decide whether to apply a federal mediation privilege or the work product

doctrine, because the attorney-client privilege protects Weldon from testifying at deposition

under the circumstances here.  Plaintiff states that she noticed Weldon's deposition because of

what Plaintiff read in the Weldon Memorandum.  See Pl.'s Reply at 1.  For the reasons discussed

above, the Weldon Memorandum is protected by the attorney-client privilege.  Defendants did

not waive the privilege when Dixon disclosed the Weldon Memorandum to Plaintiff without

school board approval.  Indeed, Defendants have asserted the privilege by seeking a protective

order and moving to quash the subpoena.  Since Plaintiff bases the deposition subpoena on the

Weldon Memorandum, a document protected by the attorney-client privilege, we will quash the

subpoena for Weldon's deposition.  See, e.g., Canel v. Lincoln Nat'l Bank, 179 F.R.D. 224, 228

(N.D. Ill. 1998) ("As Document A is privileged work product, deposition testimony regarding its

contents is also privileged."); 4 Moore's Federal Practice ¶ 26.64(1) (2d ed. 1989) ("Subject

matter that relates to [privileged material] is protected regardless of the discovery method

20

employed."); see also St. Paul Fire & Marine Ins. Co. v. ConAgra Foods, Inc., No. 07-0009,

2008 WL 222518, at *1 (S.D. Ohio Jan. 25, 2008) ("[I]nquiry at a deposition which seeks to

learn, through testimony, the fact that a document otherwise protected by the [work product]

privilege contains certain information may also be improper. . ."); Gilhuly v. Johns-Manville

Corp., 100 F.R.D. 752, 755 (D. Conn. 1983) (noting that because "the method of discovery is

unimportant," the plaintiff "need not answer any [deposition] questions regarding the substance

of [a privileged document].").

**IV.     CONCLUSION**

    For these reasons, we will deny Plaintiff's Motion to Compel Deposition of Donna

Weldon, Esquire, and grant Defendants' Motion for Protective Order.

    An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROSEMARIA MCNEIL SAMPSON          :
                                  :          CIVIL ACTION
          v.                      :          NO. 05-6414
                                  :
THE SCHOOL DISTRICT OF LANCASTER, :
ET AL.                            :

## **ORDER**

AND NOW, this 5th day of ____November____, 2008, upon consideration of Plaintiff's

Motion to Compel Deposition of Donna Weldon, Esquire (Doc. No. 49) and Defendants' Cross

Motion for Protective Order (Doc. No. 51), and all documents submitted in support thereof and

in opposition thereto, it is ORDERED as follows:

1.     Plaintiff's Motion to Compel Deposition of Donna Weldon, Esquire, is DENIED;

2.     Defendants' Cross Motion for Protective Order is GRANTED;

3.     The Subpoena issued to Donna Weldon, Esquire, is hereby QUASHED; and

4.     Plaintiff is PRECLUDED from using the Weldon Memorandum for any purposes.

IT IS SO ORDERED.

BY THE COURT:

**/s/ _R. Barclay Surrick_, Judge**