IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROSEMARIA MCNEIL SAMPSON | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 05-6414 |
| THE SCHOOL DISTRICT OF | : | |
| LANCASTER, ET AL. | : | |

**SURRICK, J.**                                                    **JUNE 12th, 2009**

## MEMORANDUM

Presently before the Court is the Motion for Summary Judgment of Defendants School District of Lancaster, Rita Bishop, Curt Baker, and Robert Bourdeaux. (Doc. No. 60.) For the following reasons, the Motion will be granted in part and denied in part.

## I.      BACKGROUND

In 2003, Rosemaria McNeil Sampson ("Plaintiff") was a middle school principal in the School District of Philadelphia. (Doc. No. 62 at 1; Sampson Dep. 30-32.) Plaintiff was recruited to join the School District of Lancaster (the "District") by its then-superintendent, Ricardo Curry ("Curry"). (Doc. No. 62 at 1-2.) In July 2003, Plaintiff signed a five-year contract with the District to serve as its Assistant Superintendent for Curriculum and Instruction. (Doc. No. 2 ¶¶ 4, 13; Doc. No. 38 ¶¶ 4, 13.) Plaintiff was responsible for supervising the District's Title I coordinator. (Doc. No. 62 at 2; Pl.'s Dep. 39, 44.) Title I is a federal program that provided the single largest source of federal funds for the District. (Baker Dep. 102.) Prior to Plaintiff's arrival, the Title I program had been "pretty much allowed to operate on its own" with little oversight. (Pl.'s Dep. 45-46.) Some of Plaintiff's tasks were to "bring[] Title I into the fold" and to "have some supervisory oversight or say over the functions of Title I." (*Id.*)

**A.     The District's Financial Mismanagement Prompts a State Audit**

Plaintiff had worked for the District for five months when, in January 2004, the Pennsylvania Auditor General began investigating the District for mismanagement, misuse of credit cards and cell phones, and other financial improprieties.  (Doc. No. 62 at 2-3.)  That month, Curry resigned from his position as superintendent.  (*Id.*)  Curry eventually entered a plea of guilty to wire fraud and was sentenced to prison.  (*Id.* at 3.)  The problems surrounding Curry and the District's mismanagement of federal funds were the subject of numerous newspaper articles.[1]  (*See* Bishop Dep., Exs. 2, 4, 5, 7, 17.)  In July 2004, Rita Bishop ("Bishop") took over Curry's position and became the District's new superintendent.  (Doc. No. 2 ¶ 6; Doc. No. 38 ¶ 6.)  Bishop hired Curt Baker ("Baker") as the District's director of finance and Robert Bourdeaux ("Bourdeaux") as its compliance coordinator for federal funding programs.  (Doc. No. 2 ¶¶ 7-8; Doc. No. 38 ¶¶ 7-8; Baker Dep. 17.)

In December 2004, the Pennsylvania Auditor General issued a report that found "significant issues pertaining to the use of federal dollars within the [District]."  (Baker Dep. 106.)  The report stated that the Pennsylvania Auditor General would be forwarding its findings to the federal authorities responsible for oversight of the District's federal funding programs.  (Pl.'s Dep. 52-53.)  The District had "a legitimate concern that the Inspector General would conduct another full investigation of [its] expenditure of federal dollars," and "since the issues had been found prior in and around the Title I area, there was particularly concern about Title I," the area that Plaintiff supervised.  (Baker Dep. 107.)  The District retained Kuntz Lesher LLP, an auditing firm, to gather financial records from the District's offices and to conduct a forensic

---

[1] The substance of many of these newspaper articles is discussed in Section III, B, *infra*.

audit.  (Baker Dep. 58, 104.)  The purpose of the audit was to evaluate the District's handling of

federal funds.  (*Id.* at 98-100; *see also id.* at 99 ("Q:  You saw smoke, you wanted someone to

check it out?  A:  You got it.  Yes.").)  The audit was meant to give the District the opportunity to

self-report the existence of any problem to the federal government.  (*Id.* at 108.)

     **B.**     **Kuntz Lesher Begins to Audit the District**

     To begin the audit, representatives of Kuntz Lesher planned to meet Bishop, Baker, and

Bourdeaux at the District's offices on Prince Street in order to gather financial records from

computer hard drives, including Plaintiff's hard drive.  (Baker Dep. 109-111; Doc. No. 62 at 7.)

The gathering of the records from computer hard drives was scheduled to take place "at a time

when no one [was] in the building" because, if information about the investigation leaked out, it

would "poison perspectively [sic] the protocols that had been set forth."  (Baker Dep. 109-11.)

Thus, the District decided to have its auditors from Kuntz Lesher gather electronic data after

school hours on the evening of January 4, 2005.  (*Id.* at 110.)

     Between 10:00 and 11:00 that night, Bishop arrived at the District's offices to unlock the

doors and allow the representatives from Kuntz Lesher to begin their electronic record collection.

(Baker Dep. 114-15.)  Upon their arrival, Bishop entered the wrong code into the building's

alarm system, activating the security alarm.  (Bishop Dep. 121-22.)  The security company

telephoned Plaintiff as the District's designated contact person.  (Pl.'s Dep. 56-57.)  As a result

of the alarm, Plaintiff drove to the District's offices, went inside, and saw that Baker and

Bourdeaux were leaving her office.  (*Id.* at 67.)  Plaintiff noticed that a copying device was

connected to her District-issued laptop computer.  (*Id.* at 69-70.)  Plaintiff encountered Bishop,

who told her that the situation would "all become clear" and that "it's part of the Auditor

General's investigation." (*Id.* at 68.) Plaintiff drove home (*id.* at 71), but her unexpected arrival had compromised the secrecy of the records collection (Baker Dep. 116). As a result, Bishop and Baker decided to hold a meeting the next morning to disclose the audit to staff and explain "what was going on." (*Id.*)

### C.   The District Discloses the Kuntz Lesher Audit to Employees

The next morning, January 5, 2005, Bishop convened a meeting with Plaintiff and various coordinators at which Bishop explained that the removal of files was part of the "ongoing investigation" regarding Curry. (Pl.'s Dep. 78-79.) Bishop did not identify any current employees by name as being subject of the investigation. (*Id.*) Nevertheless, Plaintiff wrote a letter that day to the school board president, Patrice Dixon ("Dixon"), in which she described the previous night's events and stated that, "[f]or me, this incident represented the culminating event in a series of incidents that has created what I believe to be an unreceptive work environment."[2] (Bishop Dep., Ex. 9.) Plaintiff felt that Bishop "demonstrated a lack of trust and confidence" in her. (*Id.*) Plaintiff also "felt humiliated and a sense of violation" by the unannounced audit.

---

[2] Plaintiff had difficulty working with Bishop almost from the start. (*See* Pl.'s Dep. 104 ("I just could not put up with the treatment, the demeaning treatment" as early as October 2004); Baker Dep. 40 (describing poor relationship in December 2004); Bishop Dep. 22 (noting that Plaintiff "would not do anything I asked her to do").) It is not clear who is to blame for the difficult relationship. There is evidence that Plaintiff was "generally very combative," "certainly not warm," "not open to suggestion, comment or critique," "abrupt . . . to the point of rudeness," "not collegial in her style," "always very cold," and "extremely difficult." (Baker Dep. 27-30; Bordeaux Dep. 63; *see also* Bordeaux Dep. 61 (also referring to Plaintiff as "difficult to work with").) At least one colleague testified that "essentially every interaction" with Plaintiff was challenging. (Baker Dep. 29.) Another colleague testified that his working relationship with Plaintiff was never very good and "there was nothing ever warm or friendly . . . about it." (Bordeaux Dep. 61.) However, there is also evidence that Bishop was not easy to work for. (*See* Miles Dep. 22 ("Bishop was nasty to everybody, most everybody, except for one or two folks."); Schooling Dep. 73 ("The entire environment was a hostile environment.").)

(*Id.*)  Plaintiff wrote that she had "no problems with handing over [her] files upon request," but that the audit did "not have to result in a climate of mistrust and disrespect."  (*Id.*)  Receiving no response to her letter, Plaintiff wrote a second, more lengthy letter to Dixon on February 24, 2005, in which she complained that she had been "targeted" by the District's investigation. (Bishop Dep., Ex. 11.)  Plaintiff felt that her "reputation [was] irrevocably damaged" and questioned why the District's auditors "didn't . . . simply show up during daylight hours" to gather the electronic data.[3]  (*Id.*)

### D.     Plaintiff Files an EEOC Charge, and the District Terminates her Contract

On March 28, 2005, Plaintiff filed a charge with the EEOC alleging race and gender discrimination and a hostile work environment.  (Pl.'s Dep. 161; EEOC Charge of Discrimination, Doc. No. 2, Ex. B; Doc. No. 2 ¶ 22; Doc. No. 38 ¶ 22.)  On June 1, 2005, Plaintiff participated in an EEOC mediation conference with the District.  (Doc. No. 2 ¶ 23; Doc. No. 38 ¶ 23.)  A few weeks after the EEOC mediation, on June 21, 2005, the school board held a closed-door session to determine whether to terminate Plaintiff's employment contract.[4]  (Dixon Dep. 6.)  Dixon, the school board president, was present at the session and testified at her deposition that the board discussed Plaintiff's EEOC charge and the mediation:

> Q:     At the time of the closed session, at some point before the decision [to terminate Plaintiff's employment] was made, were you aware that [Plaintiff] had filed a complaint of discrimination with the [EEOC]?

---

[3] Plaintiff did not mention in either letter that she believed her race or sex motivated the records collection.  (*See* Bishop Dep., Ex. 9.)  Plaintiff is African American and Bishop is Caucasian.

[4] Plaintiff's contract included a provision that the District could terminate Plaintiff's employment "with or without cause" at the request of the school board.  (Doc. No. 2 ¶ 13; *id.*, Ex. A; Doc. No. 38 ¶ 13.)

> A:   Yes.
> Q:   And at some point before the decision was made, were you aware that a mediation had been held in the EEOC proceeding?
> A:   Yes.
> Q:   Did the EEOC proceeding come up in the discussions on June 21, 2005?
> A:   Yes.

(Dixon Dep. 7-8.)  Dixon further testified that Plaintiff's participation in the EEOC proceeding played a role in those discussions:

> Q:   When you were discussing whether or not you were going to [terminate Plaintiff's employment], did the EEOC proceeding play any role in those discussions?
> A:   I believe it did, yes.
> Q:   And did it play a role in the decision to terminate [Plaintiff's employment]?
> A:   I believe it did, yes.
> Q:   Was it one of the things that determined the outcome on the issue --
> A:   I believe it did.
> Q:   [T]ell me why you think the EEOC proceeding was one of the things that determined the outcome of the June 21, 2005 meeting?
> A:   Because I believe it was the focus of what we were discussing when we discussed [Plaintiff] at that meeting.
> Q:   Was [Plaintiff's] filing and pursuit of an EEOC claim a determinative factor in the School Board's decision to terminate [Plaintiff's employment]?
> A:   I believe that it was.

(Dixon Dep. 8-9.)  Dixon explained that except for Plaintiff's participation in the EEOC mediation, she did not perceive any other evidence that was brought forward that would justify Plaintiff's termination:

> Q:   [C]an you tell me the reasons for your belief that [Plaintiff's] filing in pursuit of an EEOC claim was a determinative factor in the School District's decision to terminate [Plaintiff's employment]?
> A:   Because I didn't perceive that there was any other evidence that was brought forward or any other personal [sic] matters that were brought forward that would dictate that she should be terminated for any other reason.  For example, there was no evidence that she did any --

personnel evidence that she did something.

(Dixon Dep. 9-10.)  Dixon clarified in a declaration that, "[a]s I recall it, curriculum development did not come up at all during the meeting where the Board, meeting in closed session, decide[d] to terminate [Plaintiff's employment].  Rather, discussion focused on the filing of the EEOC complaint and the mediation."  (Dixon Decl., May 15, 2009, ¶¶ 1-2.)

Dixon identified two specific statements from the school board meeting that relate to the EEOC charges.  (Dixon Dep. 23 ("[T]here was a lot of chatter in the room around the whole conversation about the EEOC complaint.  And I'm not sure what anyone said [except that] I remember specifically what Art Dodge said and I remember specifically what George [Brubaker, the District's attorney,] said.").)  According to Dixon, school board member Art Dodge said that Plaintiff's settlement demand at the EEOC mediation was "bullshit," and the District's attorney George Brubaker said that Bishop "shouldn't have to work with [Plaintiff]" because of "all that had come out of the whole EEOC thing."  (*Id.* at 10-12.)  After these discussions, the school board voted to terminate Plaintiff's contract "without cause."  (Doc. No. 2 ¶ 24; Doc. No. 38 ¶ 24.)

### E.    Plaintiff Files a Complaint in Federal Court

On December 13, 2005, Plaintiff filed a four-count Complaint against the District, Bishop, Bourdeaux, Kuntz Lesher, and a representative of Kuntz Lesher alleging deprivation of a liberty interest in her reputation in violation of procedural due process under the Fourth and Fourteenth Amendments, retaliation under 42 U.S.C. § 1981, defamation, and breach of contract. (*See* Compl.)  Plaintiff filed an Amended Complaint on January 12, 2006, that added Baker as a Defendant and added claims of retaliation and hostile work environment under Title VII, 42

7

U.S.C. § 2000e.  On March 25, 2008, several of Plaintiff's claims were dismissed including

retaliation under § 1981, breach of contract, defamation (with respect to the District), and

retaliation and hostile work environment under Title VII (with respect to Bishop, Baker, and

Bourdeaux in their individual capacities and Baker and Bourdeaux in their official capacities).

(*See* Doc. No. 27.)  The parties stipulated to dismissal of the Kuntz Lesher Defendants.

(*See* Doc. No. 63.)  On April 24, 2009, the remaining Defendants – the District, Bishop, Baker,

and Bourdeaux – filed the instant Motion for Summary Judgment.  (Doc. No. 60.)  The Motion

addresses the following five claims:  (1) retaliation under Title VII; (2) violation of procedural

due process under the Fourteenth Amendment; (3) unreasonable search and seizure under the

Fourth and Fourteenth Amendments; (4) defamation; and (5) hostile work environment under

Title VII.

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine

issue of material fact exists only when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of demonstrating that there are

no facts supporting the nonmoving party's legal position.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

322-24 (1986).  Once the moving party carries this initial burden, the nonmoving party must set

forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see also*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (explaining that the

nonmoving party "must do more than simply show that there is some metaphysical doubt as to

the material facts"). The nonmoving party cannot "rely merely upon bare assertions, conclusory

allegations or suspicions" to support its claim. *Fireman's Ins. Co. v. DeFresne*, 676 F.2d 965,

969 (3d Cir. 1982). Rather, the party opposing summary judgment must go beyond the pleadings

and present evidence through affidavits, depositions, or admissions on file to show that there is a

genuine issue for trial. *Celotex*, 477 U.S. at 324. When deciding a motion for summary

judgment, we must view facts and inferences in the light most favorable to the nonmoving party.

*Anderson*, 477 U.S. at 255; *Siegel Transfer, Inc., v. Carrier Express, Inc.*, 54 F.3d 1125, 1127

(3d Cir. 1995). We must not resolve factual disputes or make credibility determinations. *Siegel

Transfer*, 54 F.3d at 1127.

## III.    DISCUSSION

Plaintiff does not object to the entry of summary judgment "on her state-law defamation

claims, on her § 1983 claim based on violations of the Fourth Amendment, or on her Title VII

hostile work environment claim." (Doc. No. 62 at 16.) In addition, Plaintiff "does not dispute

that the individual Defendants are entitled to entry of judgment in their favor based on qualified

immunity."[5] (*Id.* at 16 n.5.) Thus, there are two claims remaining in this action, both against the

---

[5] However, the doctrine of qualified immunity does not apply to Plaintiff's Title VII retaliation claim against Bishop in her official capacity. This is because under Title VII, public officials may be sued only in their official capacity, and the doctrine of qualified immunity protects against personal liability only. *See Burton v. Pa. Bd. of Probation & Parole*, No. 02-2573, 2002 WL 1332808, at *7 (D.N.J. June 13, 2002) (noting that "the doctrine of qualified immunity has no place [in a Title VII case] because it protects against personal liability only" (*citing In re Montgomery County*, 215 F.3d 367, 372-73 (3d Cir. 2000))); *Lopez v. County of Passaic*, No. 04-5789, 2007 WL 1963039, at *4 (D.N.J. June 29, 2007) (noting in a Title VII case that "[s]ince the defendants cannot be held individually liable[,] the doctrine of qualified immunity is inapplicable").

Notwithstanding this observation, Plaintiff's Title VII claim against Bishop in her official

District:[6]  (1) retaliation under Title VII; and (2) deprivation of a liberty interest in Plaintiff's

reputation in violation of procedural due process. (*See id.* at 6, 13.)

---

capacity is redundant since naming Bishop in her official capacity only serves the purpose of obtaining relief from the District, which is also a party to this suit.  *See Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1077-78 (3d Cir. 1996) (noting that individual employees cannot be held liable under Title VII); *Clarke v. Whitney*, 907 F. Supp. 893, 895 (E.D. Pa. 1995) ("[A] suit against a defendant in his or her official capacity is simply another way to sue the defendant's employing entity.").  Accordingly, Plaintiff's Title VII claim against Bishop in her official capacity will be dismissed.  *See, e.g.*, *Foxworth v. Pa. State Police*, No. 03-6795, 2005 WL 840374, at *4 (E.D. Pa. Apr. 11, 2005) (dismissing the plaintiff's Title VII discrimination claims against the individual employees in their official capacities where the plaintiff had already sued his employer for the same Title VII claim, reasoning that "because the only proper defendant in a Title VII case is the 'employer,' pursuing such claims against individuals in their official capacities would be redundant") (citations omitted), *aff'd*, 228 Fed. App'x 151 (3d Cir. 2007); *see also Galm v. Gloucester County Coll.*, No. 06-3333, 2007 WL 2442343, at *3 (D.N.J. Aug. 22, 2007) (dismissing Title VII claim against individual in his official capacity where "the only relief that could possibly be awarded to Plaintiff will come from the employer, who is a defendant"); *Fortes v. Boyertown Sch. Dist.*, No. 06-0878, 2006 WL 3043108, at *5 n.13 (E.D. Pa. Oct. 20, 2006) ("Defendants cannot be sued in their official capacity because claims against individual defendants in their official capacity are equivalent to claims against the government entity itself and as such are redundant and must be dismissed.").

[6] Plaintiff's § 1983 due process claim asserted against the individual Defendants in their official capacities will be dismissed as duplicative of the claim asserted against the District.  *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity . . . should be treated as suits against the State."); *Kentucky v. Graham*, 473 U.S. 159, 169 n.14 (1985) ("There is no longer a need to bring official-capacity actions against local government officials [because] government units can be sued directly for damages."); *Gregory v. Chehi*, 843 F.2d 111, 120 (3d Cir. 1988) (noting that official capacity suits are duplicative of the claims against the municipality and "generally represent only another way of pleading an action against an entity of which an officer is an agent"); *Dewees v. Haste*, No. 05-0212, 2009 WL 1406293, at *2 (M.D. Pa. May 18, 2009) (granting summary judgment with respect to the plaintiffs' official-capacity claims "[b]ecause the law is clear that official-capacity claims against individual government officials are redundant of those against the municipality itself"); *Swedron v. Borough*, No. 08-1095, 2008 WL 5051399, at *4 (W.D. Pa. Nov. 21, 2008) (dismissing "redundant official capacity claims against the individual defendants in this case because they are unnecessary clutter and are likely to be confusing to a jury"); *Burton v. City of Phila.*, 121 F. Supp. 2d 810, 812-13 (E.D. Pa. 2000) (noting that because claims against individual defendants in their official capacities are equivalent to claims against the governmental entity itself, they are redundant and may be dismissed).

10

A.      **Retaliation under Title VII**

The anti-retaliation provision of Title VII provides that

[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  A retaliation claim under Title VII is analyzed under a burden shifting framework.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973); *see also Jalil v. Avdel Corp.*, 873 F.2d 701, 706 (3d Cir. 1989) (noting that "[t]he burden of proof in Title VII cases is governed by the framework erected in *McDonnell Douglas* and iterated by its progeny") (citations omitted).  To establish a prima facie case of retaliation, a plaintiff must show that:  (1) she engaged in a protected activity;[7] (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action.  *Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir. 2001).  If a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment action.  *See McDonnell Douglas*, 411 U.S. at 802; *see also Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir.

---

[7] A "protected activity" is an instance in which an employee has "opposed any practice made an unlawful employment practice under this subchapter . . . or has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  The filing of an EEOC charge alleging unlawful discrimination is a protected activity.  *See Abraham v. William Paterson Coll.*, 260 F.3d 265, 287-88 (3d Cir. 2001) (noting that protected activity includes filing charges of discrimination or making complaints about discriminatory employment practices).  Participation in an EEOC mediation is likewise a protected activity.  *See Kelley v. City of Albuquerque*, 542 F.3d 802, 815 (3d Cir. 2008) (concluding that a defense attorney's participation in an EEOC mediation is a protected activity under Title VII); *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 515 (3d Cir. 1997) (noting that the plaintiffs' meeting with an EEOC investigator was a protected activity).

11

1997); *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  If the defendant meets this requirement, the burden shifts back to the plaintiff, who must show that the employer's articulated reason for the adverse employment action is a pretext for a retaliatory motive. *Fuentes*, 32 F.3d at 764-65.  The plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'"  *Id.* at 765 (*quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

Plaintiff argues that she can establish a prima facie case of retaliation because (1) "[f]iling an EEOC complaint and attending an EEOC mediation are activities protected by Title VII"; (2) her termination of employment "was rather obviously an adverse employment action"; and (3) "there is significant evidence of the connection between [Plaintiff's] pursuit of the EEOC claim and her termination [of employment]."  (Doc. No. 62 at 10.)  The District does not dispute that Plaintiff engaged in a protected activity, that the District took an adverse employment action against her, and that Plaintiff may demonstrate the requisite causal link by showing a "temporal proximity" between the protected activity and the adverse employment action.  (*See* Doc. No. 60-3 at 35-36.)  However, the District argues that it has articulated a legitimate, non-discriminatory reason for Plaintiff's termination of employment:  that "the relationship between [Plaintiff and Bishop] had become unworkable . . . as a result of [Plaintiff's] resistance to Bishop's direction with respect to curriculum."  (Doc. No. 60-3 at 35.)  The District asserts that the tension between Plaintiff and Bishop preceded Plaintiff's filing of an EEOC claim.  (*Id.* at 36.)  The District further asserts that there is insufficient evidence to show that its reason for terminating Plaintiff's employment was pretext.  (*Id.*)

Plaintiff has established a prima facie case of retaliation.  There is no dispute that Plaintiff's filing of the EEOC charge and subsequent mediation were protected activities and that Plaintiff's termination of employment was an adverse employment action.  Regarding a causal connection, we are satisfied that Plaintiff has made the requisite showing.  Plaintiff participated in the EEOC mediation on June 1, 2005.  Three weeks later, on June 23, 2005, the District terminated Plaintiff's employment.  For temporal proximity alone to establish causation, the "timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003) (*quoting Krouse*, 126 F.3d at 503).  The Third Circuit has determined that a temporal proximity of two days is sufficient to establish causation, *see Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 & n.5 (3d Cir. 2000), whereas a temporal proximity of ten days is sufficient to establish causation only when accompanied by other evidence of an employer's wrongdoing, *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003).  The Third Circuit has also emphasized that "it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997).  Here, the temporal proximity of three weeks is coupled with testimony from Dixon that the District considered Plaintiff's participation in the EEOC mediation when it decided to terminate her employment.  The evidence, taken together, establishes a prima facie case.  *See Andrews v. City of Phila.*, 895 F.2d 1469, 1484 (3d Cir. 1990) (noting that in considering a retaliation claim, the court should look at "the overall scenario").

The burden then shifts to the District to present a legitimate, non-discriminatory reason

for Plaintiff's termination of employment.  The District satisfies this burden by introducing evidence which, if taken as true, "would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."  *Fuentes*, 32 F.3d at 763 (*citing St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).  The District's burden here is "relatively light."  *Id.*  The District has satisfied that burden.  The District has proffered evidence that Plaintiff's relationship with Bishop had become "unworkable" because of Plaintiff's resistance to Bishop's direction "with respect to curriculum."  (Doc. No. 60-3 at 35.)

Finally, the burden shifts back to Plaintiff to show pretext.  Plaintiff argues that her "difficult relationship" with Bishop is not a sufficient explanation for her termination of employment because "Bishop had a difficult working relationship with just about everybody" and there is "no evidence that any of them were terminated as a result of these difficulties." (Doc. No. 62 at 10-11.)  Plaintiff also argues that Dixon was present at the school board meeting when the District decided to terminate Plaintiff's employment, and Dixon "never mentioned curriculum" when asked about the reasons for the termination.  (*Id.* at 11-12.)  Finally, Plaintiff argues that her performance evaluation showed no deficiencies in curriculum development. (Doc. No. 62 at 12-13.)  The District responds that Plaintiff's difficult working relationship with Bishop preceded Plaintiff's filing of the EEOC charge, undermining any retaliatory motive. (Doc. No. 60-3 at 35-36.)  In addition, the District asserts that Dixon could not recall any specific statements made at the school board meeting that would indicate the basis for the decision to terminate Plaintiff's employment.  (*Id.*)  The District argues that Plaintiff cannot show pretext based on Dixon's mere belief that Plaintiff's employment was terminated because of the EEOC mediation.  (*Id.*)

14

We are satisfied that Plaintiff has presented sufficient evidence of pretext to survive a motion for summary judgment.  The District appears to be correct that Plaintiff's difficult working relationship with Bishop preceded the filing of the EEOC charge.  (*See, e.g.*, Nace Dep. 16-17 (testifying about "raised voices" and slamming of doors in meetings between Plaintiff and Bishop, before the EEOC charge); *id.* at 19 (testifying about his awareness of Bishop's complaints regarding Plaintiff's job performance within months of Bishop's arrival); Baker Dep. 42 (testifying that "it was very bad before the EEOC complaint").)  However, it was not until after Plaintiff filed the EEOC charge and participated in mediation that the District actually terminated her employment.  Moreover, as Plaintiff points out, there is evidence that Bishop had difficulty working with other employees at the District, but their employment was not terminated.  (*See* Miles Dep. 22 ("Bishop was nasty to everybody, most everybody, except for one or two folks."); Schooling Dep. 73 ("The entire environment was a hostile environment.").)

The strongest evidence of pretext comes from Dixon's deposition testimony.  Dixon testified that Plaintiff's EEOC charge and mediation were discussed at length during the school board meeting at which the District decided to terminate Plaintiff's employment.  Dixon was present at the meeting and served as school board president.  Although Dixon could not remember many of the specific statements made at the meeting, her perception was that no other evidence was brought forward "that would dictate that [Plaintiff] should be terminated for any other reason."[8]  (Dixon Dep. 9-10.)  The two statements that Dixon remembered included a disparaging remark made by a school board member about Plaintiff's EEOC settlement demand

---

[8] Dixon reiterated in a declaration that the discussions at the school board meeting "focused on the filing of the EEOC complaint and the mediation."  (Dixon Decl., May 15, 2009, ¶ 2.)

and a remark made by the District's attorney that Bishop "shouldn't have to work with [Plaintiff]" because of "all that had come out of the whole EEOC thing." (*Id.* at 10-12.) Interestingly, Bordeaux testified that even though he saw Bishop every day, Bishop never told him that she wanted Plaintiff's employment to be terminated until "right around" the school board meeting. (Bordeaux Dep. 70.) Bordeaux also testified that Plaintiff's filing of the EEOC charge was "in the air" before Plaintiff's termination. (*Id.* at 71.) Dixon's testimony, along with the other evidence in this case, is enough to raise questions about the District's stated reasons for terminating Plaintiff's employment and to allow a reasonable jury to find the District's reasons "unworthy of credence." *See Fuentes*, 32 F.3d at 765 (*quoting Ezold*, 983 F.2d at 531); *see also Ray v. Iuka Special Mun. Separate Sch. Dist.*, 51 F.3d 1246, 1251 (5th Cir. 1995) (holding that the district court did not err in denying a school district's motion for judgment as a matter of law on the plaintiff's retaliation claim where a school board member testified that the plaintiff "might have been hired had it not been for the EEOC charge" based on a discussion at a school board meeting, but could not attribute the statement to any particular school board member). Summary judgment is therefore not appropriate on Plaintiff's Title VII retaliation claim.[9]

### B.    Due Process Claim – Deprivation of Interest in Reputation

To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that "(1) he was deprived of an individual interest that is encompassed within the

---

[9] Plaintiff does not dispute the District's assertion that punitive damages are not available against a municipal defendant under Title VII. (*See* Doc. No. 60-3 at 31.) Plaintiff's punitive damages claims against the District will be dismissed. *See Udujih v. City of Phila.*, 513 F. Supp. 2d 350, 358 (E.D. Pa. 2007) (noting that "when the employer is a municipality, punitive damages are not available under Title VII" (*citing* 42 U.S.C. § 1981a(b)(1))); *see also Jakimowicz v. City of Phila.*, No. 07-3327, 2008 WL 383329, at *4 (E.D. Pa. Feb. 12, 2008) (noting same and dismissing punitive damages claims against a municipal defendant under Title VII).

Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir. 2006) (*quoting Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)).  An individual has a protectable interest in his or her reputation.  *Id.* (*citing Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)).  "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."  *Id.* (*citing Wisconsin*, 400 U.S. at 437).  However, "reputation alone is not an interest protected by the Due Process Clause."  *Id.* at 236 (citations omitted).  To make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show "a stigma to his reputation plus deprivation of some additional right or interest."[10]  *Id.* (citations omitted).  The Third Circuit has referred to this as the "stigma-plus" test.  *Id.* (citations omitted).

Under the "stigma-plus" test, an employer that "creates and disseminates a false and defamatory impression about the employee" in connection with his or her termination of employment "deprives the employee of a protected liberty interest."  *Id.* (*citing Codd v. Velger*, 429 U.S. 624, 628 (1977)).  "The creation and dissemination of a false and defamatory impression is the 'stigma,' and the termination is the 'plus.'"  *Id.*  To satisfy the "stigma" prong of the test, the statements must have been (1) false and (2) made publicly.  *Id.* (citations omitted).  Termination of employment is sufficient to satisfy the "plus" prong of the test, even if, as a matter of state law, the employee lacks a property interest in the job that he or she lost.  *See id.* at 238 (noting that "a public employee who is defamed in the course of being terminated or

---

[10] When such a deprivation occurs, the employee is entitled to a name-clearing hearing. *Hill*, 455 F.3d at 236 (citations omitted).

constructively discharged satisfies the 'stigma-plus' test even if, as a matter of state law, he lacks a property interest in the job he lost").

Plaintiff maintains that the District harmed her reputation "[b]eginning with the January 4 midnight visit and continuing through the summer of 2005." (Doc. No. 62 at 16-17.) Plaintiff argues that the District did this "sometimes through affirmative conduct, [and] sometimes through inaction and silence." (*Id.* at 17.) For example, Plaintiff points to five newspaper articles and the auditor's report by Kuntz Lesher. (*Id.*) The first newspaper article is an editorial published in the *Lancaster Intelligencer-Journal* on December 15, 2004, that discusses mismanagement at the District based on the Auditor General's report. (*See* Bishop Dep., Ex. 4.) The editorial quotes the Auditor General's report for the proposition that "responsibility [for the District's lack of oversight] 'rests squarely with the school board and Superintendents Phillips and Curry.'" (*Id.*) The second newspaper article is a report published in the *Lancaster New Era* on January 13, 2005, that discusses the District's retention of Kuntz Lesher to perform an audit. (*Id.*, Ex. 7.) The article connects the audit with the Auditor General's report that called for oversight of federal funds and notes that Kuntz Lesher "took custody of files from the [District's] office on Prince Street." (*Id.*) The article quotes the District's Title I coordinator as saying that "audits are routine" so she "isn't worried." (*Id.*) The third newspaper article is a front-page report published in the *Lancaster New Era* on January 31, 2005, that discusses Curry's sentencing. (*Id.*, Ex. 5.) The last paragraph of the article, which appears on another page, mentions that Bishop had retained Kuntz Lesher to perform an audit to prepare for a federal probe and that "Kuntz Lesher took custody of documents from the district offices on Prince Street." (*Id.*) The fourth newspaper article is a report published in the *Lancaster Sunday News*

18

on February 6, 2005, that discusses the District's late-night audit and data-gathering from the

Prince Street offices.  (*Id.*, Ex. 2.)  The fifth and final newspaper article is a report published on

August 4, 2005, in the *Lancaster Intelligencer Journal* that discusses the results of the Kuntz

Lesher audit.  (*Id.*, Ex. 17.)  Whereas the previous four articles do not mention Plaintiff, the fifth

article is mostly about Plaintiff.  (*Id.*)

The August 4, 2005 article begins by noting that a lack of proper documentation was a

"pervasive problem uncovered in the [Kuntz Lesher] report."  (*Id.*)  The article continues that:

> Although the funding tracked in the audit represents only a portion of federal
> monies [in the District], auditors wrote that they believe a similar system was in place
> to handle other monies administered by the district Office of Teaching and Learning.
> At the head of OTL during the audit was Rose Sampson, whom the board
> "terminated without cause" in June.
> Sampson had ultimate responsibility for administering the federal funding,
> the report states.
> "It does not appear (Sampson) has been proactive enough in efforts to correct
> these deficiencies, we strongly recommend that the Superintendent of the District,
> Rita Bishop, take the necessary action to make this a priority," the audit reads.
> "Continuing to ignore this issue is fiscally irresponsible."

(*Id.*) (parentheses in original).  The remainder of the article discusses a written statement that

Plaintiff issued in response to the Kuntz Lesher audit, including Plaintiff's statement that the

District's actions in gathering data constituted a "gross invasion of privacy" and that Bishop's

actions "have been personally and professional [sic] demeaning, degrading and defaming to my

character."  (*Id.*)  The article reports that "Bishop declined comment on [Plaintiff's] statement"

because "I can't talk about personnel, and at this point I don't think it would be the right thing to

do."  (*Id.*)  At her deposition, Bishop clarified that she declined to comment because she was "not

going to talk about personnel, past, present or future.  Period."  (Bishop Dep. 253.)

Plaintiff argues that these articles were unfair and created a stigma in connection with her

June termination of employment in violation of due process.  (Doc. No. 62 at 15-16.)  Plaintiff claims that the Kuntz Lesher report singled her out, omitted her efforts to control federal funding, and denied her the opportunity to address the issues.  (*Id.* at 15.)  Plaintiff also argues that "[t]he unfairness was vastly compounded by the timing of the report's release," since Plaintiff's termination of employment in June suggested a connection "between the claims of the [Kuntz Lesher] report and [her] termination."  (*Id.*)  The District responds that Plaintiff cannot satisfy the "stigma-plus" test because "there is an insufficient temporal proximity" between Plaintiff's termination of employment on June 21, 2005, and the publication of the August 4, 2005 article.  (Doc. No. 60-3 at 21.)  The District further responds that the Kuntz Lesher report "does not contain false statements of fact sufficient to trigger the 'stigma' aspect of the test" because the report was not defamatory.  (*Id.*)

The evidence does not support Plaintiff's contention that the District created and disseminated "a false and defamatory impression" in connection with her termination of employment.  *Codd*, 429 U.S. at 628.  "In order to be considered 'in connection with' a termination, an allegedly defamatory statement and the firing must be at least roughly contemporaneous."  *Orelski v. Bowers*, 303 Fed. App'x 93, 94 (3d Cir. 2008) (unpublished opinion) (*citing Brennan v. Hendrigan*, 888 F.2d 189, 196 (1st Cir. 1989) (holding two-month delay fatal to due process claim); *Ewers v. Bd. of County Comm'rs*, 802 F.2d 1242, 1248 (10th Cir. 1986) (holding three-week delay fatal to due process claim); *Ulrich v. City of S.F.*, 308 F.3d 968, 983 (9th Cir. 2002) (holding five-day delay did not preclude due process claim))); *see also Freeman v. McKellar*, 795 F. Supp. 733, 738 (E.D. Pa. 1992) ("The defamation must occur in the course of terminating the individual's employment.") (citations omitted).  The August 4, 2005

article that discussed Plaintiff was published over a month *after* Plaintiff's termination of employment.  Plaintiff's termination and the allegedly false and defamatory newspaper article are not "roughly contemporaneous."  *See Orelski*, 303 Fed. App'x at 94.  Likewise, the District's release of the Kuntz Lesher report occurred sometime in late July or early August, over a month *after* Plaintiff's termination.  (*See* Bishop Dep. 245-50; *id.*, Ex. 17.)

Plaintiff's claim also fails because the District did not make any statements about Plaintiff, her activities, or her employment in the newspaper articles.  The District's only mention of Plaintiff occurred in the August 4, 2005 article in which Bishop expressly declined to comment.  Bishop appropriately explained that it would "not be right" to discuss personnel matters in the newspaper.  Under Pennsylvania state law, the personnel files of a school district employee are not "public records" that are subject to disclosure.  *See generally* 43 P.S. § 1322 (limiting access to employer's personnel files and providing that an employee may inspect his or her own personnel file); *see also Bangor Area Educ. Ass'n v. Angle*, 720 A.2d 198, 202 (Pa. Commw. Ct. 1998) (holding that teacher personnel records are not public records subject to disclosure); *W. Shore Sch. Dist. v. Homick*, 353 A.2d 93, 95 (Pa. Commw. Ct. 1976) (noting same).  To the extent that Plaintiff argues that the District "disseminated" an impression about Plaintiff through Bishop's lack of public comment, we find the argument unpersuasive.  The District's silence in the face of the independent media reports was particularly responsible under the circumstances.[11]

---

[11] Even if Bishop had wanted to disseminate an impression, it is undisputed that she did not know the extent of Plaintiff's involvement, if any.  (*See* Bishop Dep. 253-54 ("Q:  [A]s of August of '05, did you suspect [Plaintiff] of any wrongdoing?  A:  I just didn't know, and wrongdoing is – can be an oversight, or it can be intentional.").)  Moreover, Bishop had not seen Plaintiff's written statement when she was asked to comment.  (*Id.* at 256.)

The Kuntz Lesher report was also not defamatory.  Plaintiff admits that there were deficiencies in the Title I program, (Pl.'s Dep. 140 ("Q:  [D]o you dispute the report's finding that there were deficiencies?  A:  No. . . . I accept that there were deficiencies in any grant program.")), and admits that she was responsible for supervising the program, (*id.* at 39, 44-46 (outlining her job task of having "some supervisory oversight" over Title I and supervising the Title I coordinator)).  Accordingly, Plaintiff admits that she "think[s] the whole [report] is not false, but misleading." (*Id.* at 144.)  To the extent that Plaintiff disagrees with certain portions of the Kuntz Lesher report, (*see id.* at 135, 144-45), the statements merely express the auditor's opinion based on the factual deficiencies mentioned in the report.  The report is not defamatory.[12] *See Parano v. O'Connor*, 641 A.2d 607, 609 (Pa. Super. Ct. 1994) (noting that expressions of opinion based on disclosed facts are not defamatory); *Tucker v. Fischbein*, 237 F.3d 275, 282 (3d Cir. 2001) (noting that "it is not enough that a statement is embarrassing or annoying" to state a defamation claim (*citing Bogash v. Elkins*, 176 A.2d 677, 678 (Pa. 1962))).

Most importantly, the portions of the Kuntz Lesher report with which Plaintiff takes issue are not the statements of the District.  Kuntz Lesher is an independent auditing firm.  Its recommendation to the District is not a statement attributable to the District.  *See generally Harris v. Quadracci*, 48 F.3d 247, 254 (7th Cir. 1995) (holding that an allegedly defamatory statement in a magazine article could not be attributed to a non-media defendant whose relationship with the plaintiff was the subject of the article, when the article's author attributed statements to the defendant using quotation marks but used no quotation marks in the statement

---

[12] Plaintiff does not dispute that the District is entitled to summary judgment on her defamation claim.  (*See* Doc. No. 62 at 16.)

in question); Hon. Harvey Brown & Sarah V. Kerrigan, *42 U.S.C. § 1983: The Vehicle for Protecting Public Employees' Constitutional Rights*, 47 Baylor L. Rev. 619, 642 (1995) ("Publication of stigmatizing charges by news services . . . are not actionable unless those charges can be attributed to the final policymaker."). The very purpose of retaining an independent auditor was to remove any connection with the District to ensure a fair and impartial audit. When the report was released, the District made no public statements regarding Plaintiff's termination. The fact that the news media connected Plaintiff's termination with the Kuntz Lesher report – in the absence of any statement from the District – does not mean that the District violated Plaintiff's procedural due process rights. A school district is not obligated to provide a name-clearing hearing to every terminated employee who finds his or her name in the news media.

Finally, we note that Plaintiff called attention to herself in the media, increasing her exposure. Four of the five newspaper articles cited in Plaintiff's brief do not include Plaintiff's name, job title, or position. (*See* Pl.'s Dep. 108-13.) The articles merely mentioned the offices on "Prince Street" where Plaintiff worked, but this is not sufficient to link the articles to Plaintiff. Most of the articles have little or nothing to do with Plaintiff, and a reasonable reader would not have understood that the articles referred to her. (*See, e.g.*, Bishop Dep., Ex. 4 (noting that "responsibility [for the District's lack of oversight] 'rests squarely with the school board and Superintendents Phillips and Curry'"); *id.*, Ex. 7 (noting that "audits are routine").) *Cf.* Restatement (Second) Torts § 564 cmt. b. (1977) ("A defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer."). The August 4, 2005 newspaper article discusses Plaintiff, but

23

only after Plaintiff had released a written statement disavowing responsibility for the District's

problems and calling the audit process "demeaning, degrading and defaming to [her] character."

(Bishop Dep., Ex. 17.)  The District, for its part, has never spoken publicly about Plaintiff's

termination.

**IV.     CONCLUSION**

For these reasons, Defendants' Motion for Summary Judgment will be granted in part and

denied in part.

An appropriate Order will follow.

BY THE COURT:


 /s/ R. Barclay Surrick_____

U.S. District Judge